UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

M. R., a minor )
)
V. ) NO. 2:08-CV-73
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security )

REPORT AND RECOMMENDATION

This case is an appeal of the final decision of the Commissioner denying the minor plaintiff's application for childhood benefits. Both the plaintiff and the defendant Commissioner have filed Motions for Summary Judgment [Docs. 8 and 12]. These Motions have been referred to the United States Magistrate Judge under the 28 U.S.C. § 636 and the standing orders of this Court for a report and recommendation.

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human*

*Services*, 846 F.2d 345, 349 (6th Cir. 1988).

Plaintiff was born on October 7, 2005. He was diagnosed early on with congenital torticollis and plagiocephaly. Congenital torticollis is a condition in which an infant's head is tilted, with the chin pointing up in one direction while the head tilts downward in the opposite direction. This happens when the neck muscle that runs up and toward the back of the infant's neck is shortened, bringing the head down and to one side. Treatments include stretching and strengthening exercises, and, if necessary, surgery. [Doc. 13, pg. 2, footnote 3]. Plagiocephaly is a condition characterized by an asymmetrical distortion of the skull with flattening of one side. It is commonly caused by the intrauterine positioning of the fetus. Normally, as the head grows in the first year after birth the visible inequality becomes much less marked. [Doc. 13, pg. 2, footnote 4].

Other than the standard of review described above, childhood disability determinations bear little procedural resemblance to their adult counterparts. The Social Security Administration has established a three-step sequential evaluation process to determine whether an individual under the age of 18 is disabled. 20 C.F.R. § 416.924(a). First, is the child engaging in substantial gainful activity? 20 C.F.R. § 416.924(b). If not, does the child suffers from a severe impairment or combination of impairments? 20 C.F.R. § 416.924(c). If so, do the child's impairment(s) meet, medically equal, or functionally equal an impairment listed in the Listing of Impairments, and has the impairment lasted or is it expected to last for a continuous period of at least twelve months? 20 C.F.R. § 416.924(d). Naturally, the minor plaintiff has not engaged in substantial gainful activity. At the second step, the ALJ found that the plaintiff has severe impairments of

congenital torticollis and plagiocephaly as defined above. (Tr. 17).

At the third step, determining whether the impairment or combination of impairments meets or medically equals the criteria of a listing, or functionally equals a listing, the ALJ must consider the combined effect of all medically determinable impairments, even those that are not severe. 20 CFR §§ 416.923, 416.924a(b)(4), and 416.926a(a) and (c). The determination of whether an impairment or combination of impairments functionally equals the listings is made by assessing the child's functioning in six "domains." The domains used are: 1) Acquiring and using information; 2) Attending and completing tasks; 3) Interacting and relating with others; 4) Moving about and manipulating objects; 5) Caring for yourself; and 6) Health and physical well-being. 20 C.F.R. § 416.926a. In order to functionally equal the listings, the child's impairment or combination of impairments must result in "marked" limitations in two domains or an "extreme" limitation in one domain. 20 CFR § 416.926a(d).

A "marked" limitation is one in which the impairment(s) "interferes seriously" with the ability to initiate, sustain or complete activities in a particular domain. 20 CFR § 416a(e)(2). An "extreme" limitation is when the impairment(s) interferes "very seriously" with the child's ability to independently initiate, sustain, or complete activities. 20 CFR § 416a(e)(3).

The medical evidence in the record before the ALJ is summarized as follows, and basically follows the statement of the same set forth in defendant's brief:

At birth, the child was diagnosed with a heart condition (Tr. 115, 134). An EKG revealed slight hypertrophy of the left ventricular free wall, a small secundum atrial septal defect$_5$ (ASD) with a left/right shunt, trivial insufficiencies in the aortic valve, and a

3

moderately large patent ductus arteriosus (PDA) with a left/right shunt (Tr. 113-14, duplicated at Tr. 135-36, 263-64). On November 3, 2005, at age four weeks, the child was examined by Rodney J. Watson, M.D. (Tr. 124-26). The child's main problem was increased gas production and abdominal pain after feeding (Tr. 124). On examination, the child's head was normal, his cardiac condition was normal, and his development was normal for his age (Tr. 124-26).

On November 17, 2005, when the child was two months old, he saw Alicia Wright, M.D., at HMG [Holston Medical Group] (Tr. 138-39, duplicated at 150-51, 156-57, 260-62). The mother explained that the child seemed to "lose his breath" at times, had a tendency to "spit up" after most (but not all) feedings and he had some "choking episodes" (Tr. 138). On examination, Dr. Wright noted "some molding" of the child's head and heard a heart murmur (Tr. 139). She assessed heart murmur, patent ductus arteriosus, and esophageal reflux (Tr. 139). She ordered testing (Tr. 139). A Doppler study revealed a "small" ASD and spontaneous closure of PDA (Tr. 144, duplicated at Tr. 164, 262). A barium esophagram and upper GI study revealed gastroesophageal reflux (Tr. 142-43, duplicated at 162-63, 258-59).

On November 29, 2005, the child saw Susan Jeansonne, M.D. (Tr. 148-49, duplicated at Tr. 256-57). The mother reported that the child was constipated and had recently been in the hospital due to acid reflux (Tr. 148). The doctor provided samples of medication to be given with the child's formula (Tr. 149). On December 9, 2005, at age three months, the child returned to Dr. Jeansonne (Tr. 146-47, duplicated at Tr. 253-54). The child had a normal heart rate with a regular rhythm and no heart murmur (Tr. 147). The mother reported that the child was constipated, but had no significant spitting or coughing (Tr. 146). Dr.

4

Jeansonne noted that the child's head had "mild assymetry" and that the child preferred to look to the left, but that tendency had improved since the last visit (Tr. 146). Dr. Jeansonne reported that the child was an "active, well developed, well nourished infant" and held his head up well (Tr. 146).

The child saw Ashok V. Mehta, M.D., on December 8, 2005, who noted that the child had significant gastroesophageal reflux and a small ASD (Tr. 166, duplicated at Tr. 255). Neck x-rays revealed normal views of the soft tissues of the neck (Tr. 249, 251-52). Dr. Mehta noted that he was pleased that the child was "doing well" (Tr. 166). The child's acid reflux was well controlled and his EKG was normal (Tr. 166-67). Dr. Mehta reported there were no precautions necessary and the child needed no activity restrictions (Tr. 165-66).

The child went to Holston Valley Medical Center on February 20, 2006, with possible seizure activity (Tr. 168). His chest x-rays were normal (Tr. 170). He was diagnosed with upper respiratory infection and history of GERD (Tr. 168-173).

The child attended physical therapy from January 3, 2006 through March 7, 2006 (Tr. 191-197, 248, 250). In March 2006, the child's mother reported that the child was holding his head up in a prone position with no problem (Tr. 191). His passive range of motion was within normal limits in all directions, but he still had right-sided flattening of the head (Tr. 191). The physical therapist felt that the child might benefit from a helmet for skull shaping (Tr. 191). A head CT scan suggested premature closure of the skull, diagnosed as craniosynostosis (Tr. 190). Noel Tilipan, M.D., disagreed and explained that there was no evidence of true craniosynostosis; he felt the flattening was "positional molding" secondary to his torticollis (Tr. 189). He felt that the helmet was unnecessary, but left that decision up

5

to the parents (Tr. 189). In April 2006, the child was sent to physical therapy (Tr. 180, 186-87, 232-44). At intake, the child's mother reported that the child ate and slept well (Tr. 214). His ASD had recently cleared up (Tr. 214). The physical therapist noted in April 2006 that the child "did well" with all his exercises (Tr. 234). Later that month, the physical therapist noted that, although the child was still "very tight," he was progressing in his treatment (Tr. 228). By June 2006, the child's mother felt that she could continue the exercises at home and cancelled further physical therapy (Tr. 200).

In May 2006, Denise P. Bell, M.D., reviewed the child's records for the state agency (Tr. 174-79). Dr. Bell opined that, although the child's impairments were severe, they did not meet, medically equal, or functionally equal a listed impairment (Tr. 174). Dr. Bell opined that the child had no limitation in any functional domain, with the exception of health and physical wellbeing. In that area, he had a "less than marked" limitation (Tr. 177).

In June 2006, Dr. Jeansonne wrote a letter on the child's behalf to the insurance company (Tr. 183-84). She urged the insurance company to pay for the helmet as a medical necessity (Tr. 184). The child received his helmet in June 2006 (Tr. 244, 309-10).

In June 2006, at age eight months old, the child underwent a developmental evaluation and assessment by Alicia L. Taylor (Tr. 274-85). The final scores revealed that the child had an age equivalent of six months in the social and cognitive domains; five months in the adaptive and motor domains; and seven months in the communication domain (Tr. 276). He was found eligible for services based on his 37% delay in adaptive and motor development (Tr. 274).

In July 2006, the child underwent a TIPS developmental assessment (Tr. 388-89, duplicated at Tr. 396-97). He was nine months old and his developmental age was as low as four months for fine motor skills and as high as eleven months for his social development (Tr. 389). A repeat assessment was conducted in November 2006, when he was thirteen months old (Tr. 386-87, duplicated at Tr. 394-95). By that time, he was only two months' behind in his adaptive development, fine motor skills, and gross motor skills (Tr. 386-87). He was at fourteen months in his social development (Tr. 387). Ms. Chandley noted that the child was "a charming little boy" and was "very social" (Tr. 401).

In July 2006, the child saw Milford H. Marchant, M.D. (Tr. 301-02). The child's cervical spine x-rays were normal (Tr. 308). Pelvis and hip x-rays were normal (Tr. 306-07). His neurological examination was normal (Tr. 301). Dr. Marchant noted that the child was achieving his milestones with good bilateral upper and lower extremity strength (Tr. 300). Other than asymmetry in his head and face, the child appeared to be an otherwise healthy nine month old child (Tr. 300). Dr. Marchant recommended continued physical therapy (Tr. 301).

In August 2006, Nancie Schweikert, M.D., reviewed the child's records for the state agency (Tr. 287-91). Dr. Schweikert explained that the child's PDA and ASD had resolved with no residual heart murmur (Tr. 291). There were no significant complications from GERD (Tr. 291). There were no indications of significant neurological or developmental deficits (Tr. 291). He had congenital torticollis with some improvement from physical therapy and he was using a helmet for head shaping due to positional plagiocephaly (Tr. 291). Dr. Schweikert opined that the child had no limitation in any domain except his health

7

and physical well-being domain and that domain was still less than marked (Tr. 288-89). As a result, she opined that the child had severe impairments, but that his impairments, whether considered individually or in combination, did not meet, medically equal, or functionally equal a listed impairment (Tr. 286).

In August 2006, the child saw Christopher A. Miller, M.D. (Tr. 296-97). Dr. Miller scheduled a brain MRI scan because he was concerned about a possible posterior fossa lesion (Tr. 297). The scan was normal (Tr. 295). In November 2006, Dr. Miller noted that the child was "doing quite well" and he saw no need for further studies (Tr. 295).

In October 2006, the child returned to Dr. Jeansonne (Tr. 334-36). The mother reported that the child was not using his left hand as much as his right, so the doctor recommended that he see Peter Kitching, an occupational therapist (Tr. 292-94, 334). Mr. Kitching noted some "slight fine motor delays" with apparent hand weakness, especially in the left hand (Tr. 293). Mr. Kitching felt that this may have been caused by not spending enough time in prone position as an infant and that he would benefit from direct occupational therapy (Tr. 293).

In November 2006, the child saw Jon Robert Davids, M.D. (Tr. 303-05). Dr. Davids noted that the child was "a happy, healthy child" (Tr. 303). He had an obvious facial asymmetry, but his skull and upper face alignment looked fairly symmetric (Tr. 303). The child's gait was normal for his age (Tr. 304). November 2006 x-rays demonstrated that his hips were developing normally (Tr. 304). His cranial MRI scan was unremarkable (Tr. 368). Dr. Davids noted that the residual mandibular deformity was not consistent with congenital muscular torticollis (Tr. 304). He felt that further evaluation would be appropriate (Tr. 304).

8

However, he saw no need for further use of the helmet, as the child's skull deformities appeared to be resolving nicely (Tr. 304). There was "no hard evidence" for hip dysplasia (Tr. 304).

In January 2007, the child saw Larry A. Sargent, M.D. (Tr. 311). On examination, the child's face was normal except for "some very slight" underdevelopment of the left side of the face, which was "hardly noticeable" (Tr. 311). There were no obvious signs of any type of craniosynostosis (Tr. 311). Dr. Sargent felt that the child's features were "in the normal range" and should improve over time (Tr. 311). His only recommendation was to continue neck exercises (Tr. 311).

In June 2007, Ms. Chandley assessed the child's functional areas (Tr. 382). She assessed extreme limitation in the area of motor development and less than marked limitations in cognitive/communicative development and social development (Tr. 382).

Also in June 2007, John D. Heise, M.D., assessed the child's development (Tr. 383). He opined that the child had marked limitations in the areas of motor development and social development, borderline limitations in his cognitive/communication development and no evidence of limitation with responsiveness of stimuli (Tr. 383).

In July 2007, the child underwent a repeat developmental evaluation/assessment by Ms. Taylor (Tr. 404-07). She assessed a 38% delay in personal/social development, a 19% delay in adaptive development, a 33% delay in motor development, and a .1% delay in communication development (Tr. 406). He continued to be eligible for services due to this assessment (Tr. 407).

[Doc. 13, pgs. 4-10].

Dr. Susan Bland, a non-examining "medical expert," testified at the administrative hearing. This Court perceives her role as summarizing the evidence for the ALJ. In other words, it is the evidence in the record, and *NOT* the testimony of Dr. Bland, which must provide the substantial evidence to support the ALJ's findings of fact.

On August 27, 2007, the ALJ issued his hearing decision. As previously stated, he found that the minor plaintiff had not engaged in substantial gainful activity and had severe impairments. At the third step, the ALJ found that the plaintiff did not have an impairment or combination of impairments that functionally equals the listings.

The plaintiff makes two primary complaints with respect to the ALJ's findings. First, he asserts that the ALJ did not give sufficient weight to the findings of Wilma Chandley, a teacher/developmental specialist with Tennessee Infant Parent Services. Ms. Chandley opined in a "Childhood Disability Evaluation Form" (Tr. 382) that the plaintiff has "extreme" limitation in his motor skills. Ms. Chandley, while no doubt knowledgeable in her field, is not a physician and the various treatment notes of the vast majority of the plaintiff's treating physicians offer no support for a finding of any "extreme" limitation. There is substantial evidence to support the ALJ in his finding regarding the weight to be given to Ms. Chandley's assessment.

The second assignment of error is more problematic. In the record that was before the ALJ, standing basically "alone," is a form like the one prepared by Ms. Chandley described in the preceding paragraph which was filed out by John S. Heise, M.D. (Tr. 383). On that one page form, dated June 20, 2007, Dr. Heise opined that the minor plaintiff was "markedly limited" in his motor skills and social abilities. His cognitive/communicative abilities were

10

described as "borderline." Dr. Brand noted at the hearing that there were "no actual notes" of Dr. Heise, and that "there is nothing in the rest of the record that suggests that socially the child is that limited."

The Court agrees that a naked assessment by a physician whose basis of knowledge is totally unknown is entitled to little if any weight. His report is simply there without any information regarding how Dr. Heise came to those conclusions. The record remained such during the time the ALJ was mulling and preparing his hearing decision.

After the ALJ's hearing decision, plaintiff's counsel submitted further records from Holston Medical Group to the Appeals Council (Tr. 410-487). Included in these records is a record of an examination performed by Dr. Heise on June 20, 2007 (Tr. 474-477), the same date that the assessment form before the ALJ was prepared. Dr. Heise noted that during the examination, plaintiff ignored his mother unless he needed her to help with the toilet or to rescue him when he got stuck behind the exam table and couldn't find his way back out. He found the plaintiff to be "grossly nonfocal" from a neurological perspective, with minimal interaction with his mother and none toward Dr. Heise. His assessment was that the plaintiff had congenital toricollis, pervasive developmental disorder, and a working diagnosis of autism.

Obviously, the note of this visit would provide perspective for Dr. Heise's opinion on the form provided to the ALJ. While it would not necessarily be determinative on the issue of disability *vel non*, it would certainly have required further inquiry by the Commissioner.

In order for evidence to form the basis for a remand under Sentence Six of 42 U.S.C. § 405(g), there must be "a showing that [the new evidence] is material and . . . there is good

11

cause for failure to incorporate such evidence into the record [before the ALJ]." Additional evidence is considered "new" for purposes of a Sentence Six remand only if that evidence was "not in existence or available to the claimant at the time of the administrative proceeding." *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990).

Obviously, the report of Dr. Heise's exam was in existence prior to the ALJ's decision. Thus, the determination must be made whether it was "available to the claimant." Plaintiff's counsel asserts that the reason the evidence was not placed into the record before the ALJ was because "the evidence was not included with the records obtained from HMG Pediatrics at the time of the administrative hearing in this case." The last records submitted by plaintiff's counsel from HMG prior to the ALJ's decision were sent on June 7, 2007, several days before the June 20th exam at issue. The hearing itself was held on June 25, 2007. Several of the records included in the "batch" sent to the Appeals council were generated after the ALJ rendered his decision. Indeed, the records sent to the Appeals Council were apparently all printed on "12/5/07" by "Kern/ Carolyn S." They were mailed to the Appeals Council by plaintiff's counsel on December 17, 2007. It is patently unclear whether plaintiff's counsel requested records after June 7, 2007, from HMG prior to the ALJ closing the record and rendering his decision.[1]

Against this dramatic backdrop of unanswered questions is the disability claim of a three-year old boy. Dr. Heise's report of his examination raises serious concerns which the ALJ had no opportunity to address. Giving every benefit of the doubt to plaintiff's counsel,

---

[1] The ALJ, at plaintiff's request kept the record open for 21 days after the administrative hearing on June 25, 2007, so that plaintiff's counsel could get "a doctor to comment" on the assessment forms.

and assuming that HMG was tardy in providing this record in time for him to include it in the record before the ALJ, the Court finds that the evidence is "new" under the holding of *Finkelstein, supra,* and that good cause exists for it being provided initially before the Appeals Council. It is also "material" because it is an opinion by an examining and treating physician regarding the seriousness of the effects of the minor plaintiff's impairments on his condition. Thus, the Court concludes that the case should be remanded under Sentence Six for consideration of the report and assessment of Dr. Heise, along with any updated evidence regarding the plaintiff's condition and any additional examinations which the Commissioner may wish to obtain. Thus, it is respectfully RECOMMENDED that the plaintiff's Motion [Doc. 8] be GRANTED and the defendant Commissioner's Motion [Doc. 12] be DENIED.[2]

                         Respectfully Submitted:

                                s/ Dennis H. Inman
                              United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be filed within ten (l0) days of its service or further appeal will be waived. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947-950 (6th Cir. 198l); 28 U.S.C. § 636(b)(1)(B) and (C).